# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

6 Devices (Devices A - F) currently located at Milwaukee's High Intensity Drug Trafficking Area (HIDTA), 801 W. Michigan, Avenue, Milwaukee, Wisconsin

Case No. 19-863M (NJ)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:
- ■ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ■ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, Sections 841(a)(1), 846, and 843(b)

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Scott Marlow, DEA
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: May 20, 2019

*Judge's signature*

City and State: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed Name and Title*

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Scott Marlow, being first duly sworn, hereby depose and state as follows:

## I. BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Drug Enforcement Administration (DEA), and have been so employed since March 2006. Prior to my current assignment, I was employed as a police officer with the City of West Allis, a suburb of Milwaukee, Wisconsin for approximately nine (9) years. I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3. I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods, which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws. I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses

1

used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized from narcotics trafficking, monetary instruments and various assets that were purchased with the proceeds of the drug trafficking.

4. This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

## **IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

5. The property to be searched is:

a. A black LG cellular phone, LG M153, which is locked, hereinafter "Device A," recovered on May 19, 2019 from Anthony MEEKS' person.

b. A black Kyocera cellular "flip" phone E4277, hereinafter "Device B," recovered on May 19, 2019 from Jimmy BATES' person.

c. A black Apple IPhone 8 Plus, hereinafter "Device C," recovered on May 19, 2019 from Jimmy BATES' person.

d. A black Motorola XT1921 cellphone, hereinafter "Device D," recovered on May 19, 2019 from Jimmy BATES' person.

e. A black Motorola Samsung SM J260T1 cellphone, hereinafter "Device E," recovered on May 19, 2019 from Jimmy BATES' person.

2

  f. A black Samsung SM J260T1cellphone, hereinafter "Device F," recovered on May 19, 2019 from Jimmy BATES' person.

6.  Devices A through F are currently located at Milwaukee's High Intensity Drug Trafficking Area (HIDTA), 801 W. Michigan, Avenue, Milwaukee, Wisconsin.

7.  The applied-for warrant would authorize the forensic examination of Devices A through Device F for the purpose of identifying electronically stored data particularly described in Attachment B.

## II.  PROBABLE CAUSE

8.  In August of 2017, case agents initiated an investigation into the Jimmy BATES Drug Trafficking Organization (DTO). As part of the investigation, case agents have interviewed several confidential sources and have utilized one confidential source to complete three controlled purchases of heroin from BATES. As a result of the intelligence provided by the confidential sources and the controlled purchases, along with information obtained from other law enforcement officers, case agents have learned that BATES obtains kilogram amounts of heroin from several known and unknown sources of supply, and is the leader of a large-scale heroin distribution network operating in the Milwaukee metropolitan area. Case agents have identified BATES' command and organizational structure of the organization, and have been able to identify BATES' heroin distributors, including Mack CROSS.

9.  In August and September of 2017, case agents interviewed a confidential source (CS #1). CS #1 stated that s/he is in state custody for drug trafficking charges, including a heroin overdose death. CS #1 identified his source of supply of heroin as

being Jimmy Bates, aka "Big Jim," or "Homie." CS #1 stated that BATES would charge $90 per gram of heroin and that CS #1 had bought up to 200 grams of heroin at a time from BATES. CS #1 stated that s/he had observed at least three "bricks" (kilograms) of heroin at one of BATES' stash houses located at North 43rd and Burleigh Street in the City of Milwaukee. CS #1 stated that BATES is smart and switches up his stash houses often. CS #1 stated that BATES had a 2012 Audi A7 that is a Christmas red and green custom color/paint job and that he also drives rental vehicles often. CS #1 stated that BATES has several associates, including "Big Nash," Justin STAMPS, Jesse aka "Budda," Willie Jordan, and Devon Wooten.

10. For several reasons, case agents believe that CS #1 is reliable and credible. First, CS #1 has been providing continuous information since August of 2017. Second, the information CS #1 has provided is substantially against CS #1's penal interest. Third, the information provided by CS #1 is consistent with evidence obtained elsewhere in this investigation where CS #1 was not utilized, and substantial portions of CS #1's information has been corroborated through independent investigation, including information from other sources. CS #1 is in state custody for drug trafficking charges, including a heroin overdose death and is cooperating for consideration on those charges. CS #1 has a prior conviction for delivery of heroin. Finally, CS #1 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. For these reasons, case agents believe CS #1 to be reliable.

11. On multiple occasions since February of 2018, case agents interviewed a

4

confidential source (CS #3). CS #3 provided information regarding individuals who were involved in moving substantial amounts of heroin and cocaine in the Milwaukee area, including Jimmy BATES. CS #3 stated that Snowball, Juan, Howie, and Cameron Dowell were all members of BATES' drug trafficking organization in Milwaukee. CS #3 stated that BATES used to sell cocaine and heroin but was now strictly in the heroin business. CS #3 stated that it is not uncommon for BATES to pick up 4 kilograms of heroin at a time from his supplier in Chicago. CS #3 states that BATES pays $70,000-$75,000.00 per kilogram of heroin and cuts it up before selling it in Milwaukee.

12. For several reasons, case agents believe that CS #3 is reliable and credible. First, CS #3 has been providing information since February of 2018. Second, the information provided by CS #3 is substantially against his/her penal interests. Third, the information provided by CS #3 is consistent with evidence obtained elsewhere in this investigation where CS #3 was not utilized, and substantial portions of CS #3's information has been corroborated through independent investigation, including information from other sources and law enforcement reporting. CS #3 is cooperating for potential consideration on federal drug trafficking charges. CS #3 has a prior felony conviction for second-degree reckless homicide. For these reasons, case agents believe CS #3 to be reliable.

13. On September 28, 2018, case agents utilized CS #3 to conduct a controlled purchase of 125 grams of heroin from BATES for $7,000.00. Prior to the controlled buy, CS #3 and his/her vehicle was searched for contraband, rendering negative results. Prior to the controlled buy, CS #3 placed several recorded telephone calls to cellular telephone

5

number 601-918-1212, and BATES instructed CS#3 to meet him at a specific location. Case agents observed CS #3 meet with BATES, who ultimately conducted the transaction with CS #3 for 125 grams of heroin. During the controlled buy, BATES discussed that he was supplying CAIN with 200 grams of heroin, and packaged the heroin for CAIN in front of CS #3. After CS #3 obtained the heroin from BATES, case agents observed CAIN come to the "stash" house and meet with BATES. After the controlled buy, case agents met with CS #3 and seized the heroin and the recording devices. Case agents reviewed the recording device utilized by CS #3 to confirm CS #3's purchase of heroin from BATES. Case agents field tested the heroin with positive results.

14. On March 27, 2019, case agents met with CS #3 in anticipation to conduct a controlled purchase of two firearms and a ballistic vest from BATES. Prior to the meeting CS#3 and CS#3's vehicle was searched with negative results. CS#3 was given $2,000.00 in OAF, and a video/audio recording device. CS#3 left the neutral location and met with BATES. Investigators maintained surveillance of Bates as he and CS#3 travelled to several different identified locations utilized by the Bates DTO. As case agents were maintaining surveillance of BATES, they observed BATES and CS #3 travel to 3251 N. 28 St, Milwaukee, WI. As case agents were surveilling the residence, investigators observed Bates leave the residence with a suitcase and place the suitcase in the rear of CS#3's vehicle. A short time later, case agents observed CS #3 leave the residence, where he/she met with investigators at a pre-determined neutral location. Case agents took custody of the video/audio recording device and seized a camouflage ballistic vest, a Bushmaster .223 semi-automatic rifle and a Smith & Wesson .40 caliber semi-automatic

6

pistol. Case agents de-briefed CS #3, who stated that he/she was with Bates most of the day at the direction of case agents to conduct the controlled purchase of the firearms from Bates. CS# 3 stated they eventually travelled to 3251 N. 28 St, Milwaukee, WI, where they entered through the front door of the residence. CS #3 stated that when they entered, Paul Parker was at the residence with several other individuals. CS #3 stated that he/she observed Parker distribute heroin to several individuals in the kitchen area of the residence. CS #3 also stated that he/she observed a large hydraulic press in the detached garage of the residence.

15. On April 17, 2019, investigators met with CS #3 to conduct a controlled purchase of 100 grams of heroin from BATES. BATES instructed the CS to meet him at 3251 N. 28 St, Milwaukee, WI to conduct the transaction. Case agents established surveillance of the residence and observed an individual named Anthony MEEKS waiting on the front porch of the residence. Case agents observed Parker exit the residence through the front door and drive away in a white Buick sedan and drive away from the area. Case agents observed Parker return a short time later. While CS#3 was inside the residence, investigators observed CS #3 and Meeks exit the residence through the rear/side entry door and walk towards the detached garage. Case agents observed BATES exit the detached garage, and greet Parker and CS #3. Case agents observed BATES, MEEKS, and CS #3 re-enter the residence through the rear/side entry door. Investigators observed CS #3 exit the front door of the residence and drive away from the area. Shortly after CS #3 left the residence, case agents observed Parker also leave the residence and drive away from the area. Case agents met CS #3 at a pre-determined

7

location, where CS #3 and his/her vehicle were searched rendering negative results and seized the recording devices. CS #3 also provided to case agents a package containing approximately 100 grams of suspected heroin.

16. On May 19, 2019, the Milwaukee Police Department received a complaint from Takeya Warrens that her residential surveillance video showed an individual inside her residence, 5112 N. 40 St, Milwaukee WI. This residence has been identified by case agents as the residence of BATES and Warrens, who is the girlfriend of BATES. Warrens was not at the residence at the time of the alert showing an individual in her residence, but was alerted and was able to live monitor the video via cellular telephone. Milwaukee Police fficers were dispatched to the residence, and upon walking towards the rear of the residence encountered Anthony MEEKS near a Dodge truck. MEEKS was taken into custody due to the nature of the investigation. Officers then encountered BATES as he was exiting the rear door of the residence, who was subsequently detained.

17. Officers then conducted a search of the residence for additional suspects, but did not locate any further individuals. As a result of the search, officers observed in plain view a ballistic vest. During a search of MEEKS following his arrest, officers located a bag containing approximately 3.18 grams of cocaine and a LG cellular telephone (Device A). A search of BATES resulted in the seizure of approximately $7,340.00, and Kyoecra Cellular flip phone (Device B), Apple IPhone (Device C), Motorola Cellular phone (Device D), Samsung Cellular phone (Device E) and another Samsung Cellular phone (Device F).

18. On May 19, 2019, Milwaukee Police Department officers obtained a state

8

search warrant for 5112 N. 40th Street. The search resulted in the seizure of the previously observed ballistic vest, a digital scale and a semi-automatic handgun in the master bedroom of the residence.

19. Devices A through F are currently in the lawful possession of the DEA and are currently in storage at Milwaukee's High Intensity Drug Trafficking Area (HIDTA), 801 W. Michigan, Avenue, Milwaukee, Wisconsin. In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into DEA's possession.

## TECHNICAL TERMS

20. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. *Wireless telephone*: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. *Digital camera*: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can

9

usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  *Tablet*: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "Wi-Fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

21. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications I know that some of the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of these types can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

23. There is probable cause to believe that things that were once stored on Devices A through H, may still be stored there, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file

11

does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space — that is, in space on the storage medium that is not currently being used by an active file — for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media — in particular, computers' internal hard drives — contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

24. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a. Data on the storage mediums can provide evidence of a file that was once on the storage mediums but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage mediums that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals,

12

the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

25. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

13

## CONCLUSION

26. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in paragraph 5, and Attachment A to seek the items described in Attachment B.

# ATTACHMENT A

The property to be searched is:

a. A black LG cellular phone, LG M153, which is locked, hereinafter "Device A," recovered on May 19, 2019 from Anthony MEEKS' person.

b. A black Kyocera cellular "flip" phone E4277, hereinafter "Device B," recovered on May 19, 2019 from Jimmy BATES' person.

c. A black Apple IPhone 8 Plus, hereinafter "Device C," recovered on May 19, 2019 from Jimmy BATES' person.

d. A black Motorola XT1921 cellphone, hereinafter "Device D," recovered on May 19, 2019 from Jimmy BATES' person.

e. A black Motorola Samsung SM J260T1 cellphone, hereinafter "Device E," recovered on May 19, 2019 from Jimmy BATES' person.

f. A black Samsung SM J260T1cellphone, hereinafter "Device F," recovered on May 19, 2019 from Jimmy BATES' person.

## ATTACHMENT B

1. All records on the Devices described in Attachment A that relate to violations of Title 21, United States Code, Section 841(a)(1) and 846:

   a. Electronic drug or money ledgers, drug distribution or customer lists and related identifying information, drug supplier lists (including names, addresses, phone numbers, or any other identifying information); correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed lists of customers and related identifying information; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   b. any information recording MEEKS' and BATES' schedule or travel;

   c. all bank records, checks, credit card bills, account information, and other financial records;

   d. Any evidence related to either the ownership, purchase, transfer, or possession of firearms, narcotics, or drug proceeds;

   e. Electronic telephone books, address books, telephone bills, photographs, letters, personal notes, e-mails, documents, and other items or lists reflecting names, addresses, telephone numbers, addresses, and any communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

   f. Photographs, videotapes or other depictions of assets, co-conspirators, controlled substances, firearms, or other activities related to drug trafficking or money laundering.

   g. Records of Internet Protocol addresses used; records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user typed web addresses.

16

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

17